**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ANTHONY G. MOSS, | ) | |
| | ) | CASE NO. 3:14CV83 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE GREG WHITE |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social | ) | |
| Security | ) | **MEMORANDUM OPINION & ORDER** |
| | ) | |
| Defendant. | ) | |

Plaintiff Anthony G. Moss ("Moss") challenges the final decision of the Acting Commissioner of Social Security, Carolyn W. Colvin ("Commissioner"), denying his claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. § 1381 *et seq*. This matter is before the Court pursuant to 42 U.S.C. § 405(g) and the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).

For the reasons set forth below, the final decision of the Commissioner is VACATED and the case REMANDED for further consideration consistent with this Opinion.

## I.  Procedural History

On September 17, 2010, Moss filed an application for SSI alleging a disability onset date

of June 16, 1995 and claiming he was disabled due to chronic back pain, a pinched nerve, breathing problems, and "mechanical aorta valve."[1] (Tr. 115, 134.)  His application was denied both initially and upon reconsideration.  (Tr. 48-54.)  Moss timely requested an administrative hearing.  (Tr. 55.)

On August 22, 2012, an Administrative Law Judge ("ALJ") held a hearing during which Moss, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 516-547.) During the hearing, Moss amended his disability onset date to September 17, 2010.  (Tr. 17.)  On September 28, 2012, the ALJ found Moss was able to perform a significant number of jobs in the national economy and, therefore, was not disabled.  (Tr. 17-27.)  The ALJ's decision became final when the Appeals Council denied further review.   (Tr. 6-8.)

## II.  Evidence

### Personal and Vocational Evidence

Age fifty-three (53) at the time of his administrative hearing, Moss is a "person closely approaching advanced age" under social security regulations.  *See* 20 C.F.R. §  416.963 (d). Moss has a 9th grade education and no past relevant work.  (Tr. 19.)

### Hearing Testimony

During the August 22, 2012 hearing, Moss testified to the following:

- He completed the ninth grade.  He was in special education classes and his reading is "not so good."  He can do basic addition and subtraction "somewhat." (Tr. 524-525.)

- He lives with his wife in an apartment. His wife is on disability due to two

---

[1]  Moss filed a previous application for SSI and was allowed benefits.  These benefits, however, ceased when he went to jail.  (Tr. 38.)  Moss then filed another application for SSI in July 2005, which was denied by an ALJ on February 26, 2008.  (Tr. 38-45.)

dislocated discs, bipolar disorder, and chronic mood swings.  (Tr. 523.)

- He last worked in 1990 or 1991.  He does not have a driver's license.  (Tr. 524, 527.)

- He cannot work because he has chronic arthritis all through his joints.  He suffers from chronic back pain, including sharp pain down his spine.  He also has "bad arthritis" in his hands.  Sometimes he cannot move his hands at all because they lock up.  There have been times when his knuckles have swollen to the size of golf balls.  In addition, he has difficulty breathing and is often fatigued due to his heart problems.  (Tr. 527, 529-530, 538.)

- He has particular difficulty breathing during periods of high humidity.  Cold weather "stirs up" his arthritis.  (Tr. 538-539.)

- He is heavily medicated and relies on his medication to cope with the pain.  He takes oxycodone, flexeril, coumadin, dilitiazem, and lasix.  He does not suffer any side effects from his medications.  (Tr. 532-533, 534, 538.)

- His physical impairments make it difficult for him to stand, walk, lift, and bend.  He cannot stand for very long and is in terrible pain after washing only 3 to 4 dishes.  He can walk about a half block at the most before having to stop.  He has been using a cane for about a year, although it was not prescribed by his doctor.  He can sit for 2 to 3 hours straight depending on the pain. Sometimes the pain is so great that he cannot sit for that long and has to stand up and pace.  He can carry a gallon of milk.  He can bend over and touch his knees, but it is very painful.  He cannot touch his toes.  Sometimes he has difficulty reaching overhead.  (Tr. 527-529.)

- He usually lays down and watches television all day.  He is always lying down during the day.  Sometimes he cannot get out of bed because of the pain.  He can shower, dress, and feed himself, but his wife does everything around the house, including preparing meals.  (Tr. 528, 531-532, 535.)

- He is not a good sleeper.  He is up and down every two to three hours at night.  He has been this way since the 1980's, when he started having nightmares about the devil.  (Tr. 535.)

- He has mental health issues in addition to his physical impairments.  He has been hearing things for the past two years.  His "thinking abilities [are] crazy right now" and he has difficulty maintaining focus.  He does not get along well with others and has trouble "focusing and dealing with people."  (Tr. 530, 535-536, 540.)

The ALJ determined Moss had no past relevant work.  (Tr. 542.)  She then posed the

3

following hypothetical to the VE:

> Let's assume we have a hypothetical individual vocationally situated as is our claimant.  Let's first assume that that individual can perform all the functions of light work except standing or walking no more than 75 percent of the day; work that can be done in a seated or a standing position; occasional climbing of stairs; no climbing of ladders; rare– and by rare, I mean less than occasionally but not completely precluded– stooping greater than 90 degrees; occasional kneeling and crouching; no crawling; rare exposure to temperature extremes and humidity; occasional exposure to respiratory irritants; no exposure to obvious hazards, which includes unprotected heights, dangerous machinery, vehicles moving in close quarters– and those would be due to the inability to quickly move out of the way of dangers– work with an SVP of 1 to 2 where the pace or productivity is not dictated by an external source over which the individual has no control, such as the assembly line or conveyer belt.  The work should also be repetitive in nature; rare contact with the public and occasional contact with coworkers and supervisors and no working in tandem with others.  Is there any work that such an individual could perform?

(Tr. 543.)

The VE testified such an individual could perform the jobs of packager, shipping weigher, and production inspector.  (Tr. 544.)  The VE clarified that "[d]espite the fact that the DOT does not recognize that positions may allow for an ability to sit or stand, these positions . . . are, indeed, performed on that basis.  And that's based on my experience with job placement and labor market conditions."  (Tr. 543-544.)

The ALJ asked whether the jobs identified would be available if the individual needed to use a cane for walking beyond the work station.  (Tr. 544.)  The VE stated that use of a cane would not affect those jobs "for any ambulation activities" but "would effect it if the assistive device was needed for the standing component of the sit/stand aspect since bilateral upper extremity involvement is needed for completion of job tasks."  *Id.*

The ALJ also asked whether the identified jobs had any "allowance to lie down during the course of a work day."  (Tr. 545.)  The VE responded that they did not.  *Id.*  Finally, the ALJ

4

asked whether the identified jobs required any reading. *Id.* The VE stated "[t]here would not be any reading component for completion of the functions of the position." *Id.*

Moss' attorney then asked the VE the following:

Q:   I'm assuming that if the person were limited to 10 pounds and standing and walking occasionally, that's just sedentary work, correct?

A:   That's correct.

(Tr. 545-546.)

### III.  Standard for Disability

A disabled claimant may be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201. The entire process entails a five-step analysis as follows: First, the claimant must not be engaged in "substantial gainful activity."  Second, the claimant must suffer from a "severe impairment."  A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities."  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets a required listing under 20 C.F.R. § 404, Subpt. P, App. 1, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000).  Fourth, if the claimant's impairment does not prevent the performance of past relevant work, the claimant is not disabled. For the fifth and final step, even though the claimant's impairment does prevent performance of past relevant work, if other work exists in the national economy that can be performed, the claimant is not disabled. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

5

**IV.  Summary of Commissioner's Decision**

The ALJ found Moss established medically determinable, severe impairments, due to history of valve replacement with Coumadin therapy; degenerative disc disease at L3-S1; degenerative joint disease L3-4; thoracic spine degenerative joint disease; depression and adjustment disorder with mixed anxiety/depression; however, his impairments, either singularly or in combination, did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (Tr. 19-21.)  Moss was determined to have a Residual Functional Capacity ("RFC") for a limited range of light work.  (Tr. 21.)  The ALJ then used the Medical Vocational Guidelines ("the grid") as a framework and VE testimony to determine that Moss was not disabled. (Tr. 25-27.)

**V.  Standard of Review**

This Court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d

6

762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.  *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied.  Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F.Supp. 2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v.*

*Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  Analysis

### Treating Physician Hussein

Moss argues the ALJ erred because the decision entirely ignores the opinion of his treating cardiologist, Fadhil Hussein, M.D., F.A.C.C.  Moss asserts "[t]here is no mention of this opinion" in the decision and the ALJ "failed to provide any reason, let alone good reason, for the weight given to Dr. Hussein's opinion."  (Doc. No. 15 at 11.)  He maintains Dr. Hussein's opinion is important because "it is inconsistent with an ability to perform the range of light work identified by the [ALJ] and consistent with sedentary work exertionally."  *Id.*  He notes that "[a]t age 51 (amended onset date), Mr. Moss is disabled under the Medical-Vocational Guidelines 'Grids,' even if he could perform sedentary work."  *Id.*  Moss also asserts that Dr. Hussein's opinion is supported by "the objective medical record documenting longstanding cardiac issues."  *Id.*

The Commissioner argues the ALJ's failure to address Dr. Hussein's opinion constitutes harmless error.[2]  She maintains the decision indirectly addressed Dr. Hussein's opinion when it accorded "some weight" to the opinion of a state agency physician, who found that Dr. Hussein's opinion deserved no weight because it was "remote" in time.  (Doc. No. 18 at 3.)  The Commissioner also argues that, consistent with *Drummond v. Comm'r of Soc. Sec*., 126 F.2d 837 (6th Cir. 1997), the instant residual functional capacity ("RFC") finding "closely tracks" the RFC

---

[2] The Commissioner's Brief is five pages long and contains no statement of facts or discussion of the relevant medical evidence.  Her legal argument with respect to the ALJ's failure to address Dr. Hussein's opinion consists of only two paragraphs.  (Doc. No. 18.)

finding in the 2008 decision denying Moss' previous SSI application. The Commissioner asserts

this is appropriate because "Plaintiff's condition has not improved since the prior

determination." *Id.*

Under Social Security regulations, the opinion of a treating physician is entitled to

controlling weight if such opinion (1) "is well-supported by medically acceptable clinical and

laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence

in [the] case record." *Meece v. Barnhart*, 2006 WL 2271336 at * 4 (6th Cir. Aug. 8, 2006); 20

C.F.R. § 404.1527(c)(2). "[A] finding that a treating source medical opinion . . . is inconsistent

with the other substantial evidence in the case record means only that the opinion is not entitled

to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*,

581 F.3d 399 (6th Cir. 2009) (*quoting* Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9); *Meece*,

2006 WL 2271336 at * 4 (Even if not entitled to controlling weight, the opinion of a treating

physician is generally entitled to more weight than other medical opinions.) Indeed, "[t]reating

source medical opinions are still entitled to deference and must be weighed using all of the

factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[3]

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the

ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently

specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating

---

[3] Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

source's medical opinion and the reasons for that weight.'" *Rogers*, 486 F.3d at 242 (quoting

Soc. Sec. Ruling 96-2p, 1996 SSR LEXIS 9 at * 5).  The purpose of this requirement is two-fold.

First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,'

particularly where a claimant knows that his physician has deemed him disabled and therefore

'might be bewildered when told by an administrative bureaucracy that she is not, unless some

reason for the agency's decision is supplied.'" *Id*. (quoting *Wilson v. Comm'r of Soc. Sec*., 378

F.3d 541, 544 (6ᵗʰ Cir. 2004)).  Second, the explanation "ensures that the ALJ applies the treating

physician rule and permits meaningful appellate review of the ALJ's application of the rule."

*Wilson*, 378 F.3d at 544.  Because of the significance of this requirement, the Sixth Circuit has

held that the failure to articulate "good reasons" for discounting a treating physician's opinion

"denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified

based upon the record."  *Rogers*, 486 F.3d at 243.

     In some circumstances, however, a violation of the "good reasons" rule may be considered

"harmless error."  The Sixth Circuit has found these circumstances present where (1) "a treating

source's opinion is so patently deficient that the Commissioner could not possibly credit it," (2)

"the Commissioner adopts the opinion of the treating source or makes findings consistent with

the opinion," or (3) "the Commissioner has met the goal of § 1527(d) - the provision of the

procedural safeguard of reasons - even though she has not complied with the terms of the

regulation." *Wilson*, 378 F.3d at 547.  *See also Cole v. Astrue,* 661 F.3d 931, 940 (6ᵗʰ Cir. 2011);

*Nelson v. Comm'r of Soc. Sec*., 195 Fed. Appx. 462, 470-471 (6ᵗʰ Cir. 2006); *Hall v. Comm'r of*

*Soc. Sec.,* 148 Fed. Appx. 456, 464 (6ᵗʰ Cir. 2005).  In the last of these circumstances, the

procedural protections at the heart of the rule may be met when the "supportability" of the

doctor's opinion, or its consistency with other evidence in the record, is indirectly attacked via an ALJ's analysis of a physician's other opinions or his analysis of the claimant's ailments. *See Nelson*, 195 Fed. Appx. at 470-471 (6th Cir. 2006); *Hall,* 148 Fed. Appx. at 464 (6th Cir. 2005); *Friend v. Comm'r of Soc. Sec.*, 375 Fed. Appx. 543, 551 (6th Cir. 2010). In other words, "[i]f the ALJ's opinion permits the claimant and a reviewing court a clear understanding of the reasons for the weight given a treating physician's opinion, strict compliance with the rule may sometimes be excused." *Friend*, 375 Fed. Appx. at 551.

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406. The ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984). According to 20 C.F.R. § 416.927(d)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability. This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled. "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." *Id*. It is the Commissioner who must make the final decision on the ultimate issue of disability. *Duncan*, 801 F.2d at 855; *Harris*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

11

Here, the record reflects Moss has a longstanding history of cardiac problems.[4]  In 1970, when he was approximately eleven years old, Moss underwent aortic valve replacement surgery. (Tr. 328.)  His aortic valve subsequently required surgical repair in 1997.[5]  *Id.*  In July 2006, Moss' then-treating cardiologist, Fadhil A. Hussein, M.D, F.A.C.C., ordered a cardiac catheterization.  (Tr. 339.)  It showed that Moss' "left anterior descending has a moderate amount of vasospasm . . . in the mid portion that improved with intracoronary Nitroglycerin injection." *Id*.  No coronary artery disease was noted.  *Id*.

On March 28, 2008, Moss presented to Dr. Hussein for a follow-up visit.[6]  (Tr. 270.) Moss complained of fatigue and weight loss, but denied chest pain, dyspnea, or palpitations.  *Id.* Dr. Hussein noted Moss' past medical history of atrial fibrillation; history of multiple valve surgeries; and, history of heart murmur.  *Id.*  He performed an echocardiogram during Moss' visit, which revealed "normal [left ventricle] function, mild to moderate [left ventricle hypertrophy] bio-prosthetic valve in the aortic valve position with mild to moderate [aortic stenosis], mild MR, mild to moderate [tricuspid regurgitation], and mild pulmonary

---

[4] Moss also suffers from degenerative disc disease, degenerative joint disease, and depression/adjustment disorder.  As they are not relevant to Moss' sole assignment of error, the medical records regarding these conditions will not be recounted herein.

[5] Specifically, treatment notes of Moss' treating cardiologist, Fadhil A. Hussein, M.D, F.A.C.C, state as follows: "History of severe periprosthetic aortic valve insufficiency, status post resection of subaortic stenosis in 1970.  Status post repair of recurrent subaortic stenosis and AVR utilizing a 19 mm St. Jude HP valve.  Status post redo sternotomy AVR-aortic root enlargement utilizing a 21 mm St. Judge valve conduit, re-resection of subaortic stenosis, with ascending aorta replacement done July 14, 1997."  (Tr. 328.)

[6] Moss began regular treatment with Dr. Hussein in November 2005, and saw him every 3 to 6 months as needed.  (Tr. 233.)  The medical record before the ALJ, however, contains only three treatment notes from Dr. Hussein, from March 2008, March 2010, and October 2010. (Tr. 270, 328, 323.)

hypertension." (Tr. 270, 273.)  Dr. Hussein determined Moss had a normal sinus rhythm and his heart rate was well-controlled.  (Tr. 270.)  He noted the etiology of Moss' fatigue and weight loss was unclear, and ordered blood work.  *Id.*  Dr. Hussein described Moss' condition as stable and ordered him to continue on his current medications, Cardizem and Coumadin.  *Id.*

On that same date, Dr. Hussein completed a Basic Medical Form for the Lucas County Department of Job and Family Services.  (Tr. 233-234.)  Therein, he described Moss' medical conditions as chronic atrial fibrillation with coumadin therapy; history of multiple valve surgeries; and, vasospasm (coronary).  (Tr. 233.)  He noted that Moss' first visit was in November 2005 with office visits every 3 to 6 months as needed.  *Id.*  With regard to Moss' physical functional capacity, Dr. Hussein stated Moss could lift/carry no more than 6 to 10 lbs. (Tr. 234.)  He also noted that Moss' standing and walking capabilities were affected, but did not offer an opinion as to how many hours Moss could stand/walk during a normal eight hour work day.  *Id.*  Dr. Hussein noted no significant limitations in Moss' abilities to push/pull, bend, reach, handle, or engage in repetitive foot movements.  *Id.*  Finally, Dr. Hussein determined that Moss' physical limitations were permanent in nature.  *Id.*

On November 5, 2009, Moss presented to the Flower Hospital Emergency Center with complaints of sudden onset chest pain and shortness of breath.  (Tr. 470-481.)  He was placed on a cardiac monitor, which showed normal sinus rhythm.  (Tr. 471.)  An EKG was performed, which was normal.  (Tr. 473.)  The emergency room physicians consulted with Dr. Hussein, who determined based on the normal EKG findings that Moss did not need further treatment or admission.  (Tr. 476.)  He indicated Moss should take his cardiac medication as prescribed and follow-up with Dr. Hussein on an outpatient basis.  *Id.*

13

The next treatment note in the medical record from Dr. Hussein is dated March 18, 2010. (Tr. 328.)  On examination, Dr. Hussein found regular heart rate and rhythm, but noted "loud secondary heart sound, loud mechanical valve sound, and aortic flow murmur."  *Id.*  Dr. Hussein concluded Moss was "hemodynamically stable with no evidence of fluid overload," but observed that "[u]nfortunately, he has mild to moderate [aortic stenosis] and mild MR as documented on the most recent echocardiogram."  *Id.*  He continued Moss on his current medications (Cardizem, Coumadin, Flexeril, and Percocet) and ordered a follow-up visit in one year.  *Id.*

On October 13, 2010, Moss underwent an echocardiogram which showed (1) normal left ventricular size and wall thickness with low normal left ventricular function; (2) moderately dilated left atrium and moderately dilated right atrium; (3) mildly dilated right ventricle with mild right ventricular dysfunction; (4) aortic valve replacement with trace aortic insufficiency and moderate to severe aortic valve stenosis; (5) thickened mitral valve with mild MR: and, (6) mild to moderate tricuspid regurgitation.   (Tr. 259.)

Moss followed-up with Dr. Hussein on October 21, 2010, reporting chest heaviness and palpitations.  (Tr. 323.)  On examination, Dr. Hussein noted regular rate and rhythm, a "crisp valve sound," and systolic ejection murmur.  *Id.*  A holter monitor electrocardiogram was performed that day, which revealed premature atrial complexes; supraventricular tachycardia, non-sustained; sinus rhythm/BBB; sinus bradycardia/BBB; and, sinus tachycardia/BBB.  (Tr. 258.)  Dr. Hussein concluded Moss' chest heaviness and palpitations were "probably secondary to ventricular ectopy" and ordered that a 24 hour holter monitor be performed.  (Tr. 323.)

On June 8, 2011, state agency physician Leon Hughes. M.D., completed a physical residual functional capacity assessment.  (Tr. 341-348.)  Dr. Hughes concluded Moss could lift

14

and carry 10 pounds frequently and 20 pounds occasionally; stand and/or walk for a total of 6 hours in an 8 hour workday; and, sit for a total of 6 hours in an 8 hour workday. (Tr. 342.) He further offered that Moss had unlimited push/pull capacity and could frequently climb ramps/stairs, stoop, kneel, and crouch. (Tr. 342-343.) However, Moss could only occasionally crawl and could never climb ladders, ropes or scaffolds due to his chronic back pain. *Id.* Dr. Hughes further opined that Moss must avoid all exposure to unprotected heights and machinery; and avoid concentrated exposure to extreme cold, extreme heat, humidity, and fumes, odors, gases, dusts, and poor ventilation. (Tr. 345.) Finally, Dr. Hughes noted that "[t]here is a functional capacity evaluation in file done by Job and Family Services in 2008 but this is being given no weight as this is remote." (Tr. 347.)

On April 18, 2012, Moss established care with cardiologist Syed Sohail Ali, M.D. (Tr. 493-494.) Moss' chief complaint was fatigue. (Tr. 493.) Dr. Ali noted a past medical history of aortic valve pathology; chronic back pain; osteoarthritis; and, chronic smoking. *Id.* He remarked that Moss had not seen a cardiologist for over a year and had failed to have his coumadin level checked "for a long time." *Id.* On examination, Dr. Ali noted that Moss' "[h]eart rate was regular in rate and rhythm with loud aortic valve prosthesis sound with a 3/6 systolic murmur." *Id.* An EKG performed that day showed ectopic atrial bradycardia with left ventricular hypertrophy and QRS widening. *Id.* Dr. Ali ordered blood work and a 2D transthoracic echocardiogram for evaluation of valve function. *Id.* He also encouraged Moss to quit smoking. (Tr. 494.)

An echocardiogram performed on April 20, 2012 showed overall preserved left ventricular systolic function; reduced left ventricular diastolic compliance; mild mitral and tricuspid

15

regurgitation; and normally functioning St. Jude aortic valve with trace to mild insufficiency.

(Tr. 496.) It also showed a left ventricular estimated ejection fraction of 55%. *Id.*

In the decision, the ALJ acknowledged that Moss' severe impairments included "history of

valve replacement with Coumadin therapy." (Tr. 19.) After recounting the medical evidence

regarding Moss' degenerative disc and joint disease, the ALJ discussed Moss' cardiac

impairment as follows:

> The claimant also testified that the humidity affects him and he experiences
> fatigue which he explained comes and goes. He added later that he has problems
> with breathing due to heart problems. The claimant has a history of congenital
> aortic valve disease. He had aortic valve surgery during 1970 and repairs in
> 1994 and 1996. During October 2010, there were some abnormal heart findings.
> (Exhibit C-5F). Although the claimant reports issues with fatigue, during April
> 2012, cardiac testing revealed an ejection fraction of 55 per cent, which is
> considered low normal. In addition, at that time he denied shortness of breath or
> chest pain. It is also noted that the claimant had not seen a cardiologist in more
> than a year prior to this visit and he was referred to the office to re-establish
> cardiology care (Exhibit C-18F).

(Tr. 23.) With regard to the opinion evidence, the ALJ found that "the State Agency physician's

physical assessment is generally consistent with the evidence of record" and accorded it "some

weight." (Tr. 25.) There is no discussion of Dr. Hussein's March 2008 opinion or, indeed, any

express mention of Dr. Hussein in the decision.

The ALJ then assessed the following RFC:

> After careful consideration of the entire record, the undersigned finds that the
> claimant has the residual functional capacity to perform light work as defined in
> 20 CFR 416.967(b) except: standing/walking no more than 75 percent of the day;
> work that can be performed in a seated or standing position; occasional climbing
> of stairs; no climbing of ladders; rare (meaning less than occasionally but not
> completely precluded) stooping greater than 90 degrees; occasional kneeling or
> crouching; no crawling; rare exposure to temperature extremes and humidity;
> occasional exposure to respiratory irritants; no exposure to obvious hazards,
> which include unprotected heights, dangerous machinery, or vehicles moving in
> close quarters, due to inability to quickly move out of the way of dangers; work

16

> with an SVP of 1 to 2, where the pace of productivity is not dictated by an
> external source over which the claimant has no control such as an assembly line
> or conveyor belt; work should be repetitive in nature; rare contact with the public;
> occasional contact with coworkers and supervisors; and no working in tandem
> with others.

(Tr. 21.)

As noted above, the ALJ does not address Dr. Hussein's March 2008 opinion that Moss

was limited to lifting/carrying no more than 6 to 10 pounds and that this limitation was

permanent in nature.  The Commissioner does not challenge that Dr. Hussein was Moss'treating

physician at the time.  Nor does the Commissioner argue that the ALJ was not required to

address Dr. Hussein's opinion because it was rendered several years prior to Moss' September

2010 onset date.

Rather, the Commissioner argues the ALJ's failure to discuss Dr. Hussein's opinion

constitutes harmless error under *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 547 (6th Cir.

2004).  Specifically, the Commissioner maintains the decision "indirectly addressed" Dr.

Hussein's opinion through analysis of the other evidence in the record, to include according

"some weight" to Dr. Hughes' report that Dr. Hussein's opinion was not relevant because it was

"remote" in time.  (Doc. No. 18 at 3.)  The Commissioner further asserts that Dr. Hughes

considered Dr. Hussein's October 2010 treatment notes, "yet still opined that Plaintiff was

capable of lifting or carrying 20 pounds occasionally and 10 pounds frequently, and standing,

walking, and sitting about six hours in an eight hour day." *Id.*  Because this is "consistent with

the ALJ's RFC determination," the Commissioner argues the failure to address Dr. Hussein's

opinion is harmless.

At the time he rendered his opinion, Dr. Hussein had treated Moss for his heart condition

17

for over two years.  He specifically identified Moss' medical problems (chronic atrial

fibrillation, history of multiple valve surgeries and coronary vasospasm) and opined both that

Moss' standing/walking capabilities were affected and that he was unable to lift/carry more than

6 to 10 pounds.  (Tr. 233-234.)  Dr. Hussein also expressly concluded that Moss' physical

limitations were permanent in nature.  *Id*.  In a brief submitted to the ALJ prior to the hearing,

Moss identified Dr. Hussein's March 2008 opinion and relied upon it in arguing that he was

disabled.  (Tr. 209-210.)  Moreover, during the hearing (and in response to a question from

Moss' attorney), the VE testified that the limitations identified by Dr. Hussein would constitute

sedentary work.  (Tr. 545-546.)  The Commissioner does not contest that, because Moss was

over fifty years old as of his amended onset date, he would be considered disabled under the

Medical-Vocational Guidelines ("Grids"), even if he could perform sedentary work.

In light of the above, the Court finds the ALJ was required to address Dr. Hussein's

opinion and provide "good reasons" for discounting it; i.e., "reasons that are 'sufficiently

specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating

source's medical opinion and the reasons for that weight.'"  *Rogers*, 486 F.3d at 242 (quoting

Soc. Sec. Ruling 96-2p, 1996 SSR LEXIS 9 at * 5).  Clearly, the ALJ failed to do so.  There is

no mention of Dr. Hussein's March 2008 opinion anywhere in the decision and no explanation is

provided regarding the ALJ's implicit rejection of Dr. Hussein's lifting/carrying restrictions.

The ALJ fails to even identify Dr. Hussein as one of Moss' treating physicians, despite the fact

that he appears to have regularly treated Moss from November 2005 to at least October 2010.

The only indication that the ALJ was aware of Dr. Hussein's treatment of Moss for his

longstanding cardiac issues is the ALJ's passing reference to the fact that "[d]uring October

2010, there were some abnormal heart findings."  (Tr. 23.)

Based on the above, the Court finds the ALJ failed to provide "good reasons" for implicitly rejecting Dr. Hussein's March 2008 opinion.  The only question remaining is whether the ALJ's failure to do so constitutes "harmless error."  The Court finds it does not.  As noted above, the Sixth Circuit has found that a violation of the "good reasons" rule may be considered "harmless error" where (1) "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it," (2) "the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion," or (3) "the Commissioner has met the goal of § 1527(d) - the provision of the procedural safeguard of reasons - even though she has not complied with the terms of the regulation." *Wilson*, 378 F.3d at 547.

Here, the Commissioner appears to rely on the third of these exceptions; i.e., that the ALJ met the goal of the "good reasons" requirement by "indirectly addressing" Dr. Hussein's opinion through its discussion of other evidence in the record.  The Court rejects this argument.  The fact that the ALJ accorded "some weight" to a state agency physician opinion that itself rejected Dr. Hussein's opinion as "remote" is wholly insufficient to excuse compliance with the "good reasons" requirement.  First, the ALJ's discussion of Dr. Hughes' opinion is cursory, at best.  The decision states only that Dr. Hughes' opinion is accorded "some weight" because it is "generally consistent" with the record, but fails to explain the basis for this statement.  The ALJ also fails to make any express mention of the fact that Dr. Hughes rejected Dr. Hussein's 2008 opinion[7] as "remote."  Coupled with the fact that the ALJ did not even acknowledge Dr. Hussein

---

[7] Dr. Hughes' opinion does not identify Dr. Hussein's 2008 opinion as a treating physician opinion and describes it only as "a functional capacity evaluation in file done by Job and Family Services in 2008." (Tr. 347.)

as a treating physician, the Court is unwilling to find that the ALJ's general concurrence with Dr. Hughes' opinion is sufficient to meet the goal of the "good reasons" requirement with respect to Dr. Hussein.

Second, the Court rejects the Commissioner's apparent argument that an ALJ's failure to provide "good reasons" for rejecting a treating physician opinion may be excused where the ALJ agrees with a state agency physician who rejected that opinion. This Court has previously ruled that an ALJ cannot base his or her rejection of a treating physician's opinion upon an inconsistency with a state agency physician opinion. *See, e.g., Rudish v. Colvin*, 2014 WL 6879314 (N.D. Ohio Dec. 4, 2014); *Brewer v. Astrue*, 2011 WL 2461341 at *7 (N.D. Ohio Jun. 17, 2011) ("To do so would turn the treating physician rule on its head [as] [i]t is well established that the opinions of non-examining physicians carry little weight when they are contrary to the opinion of a treating physician."), *citing Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987) (finding that the opinion of a non-examining physician "cannot provide a sufficient basis for rejecting the opinions of plaintiff's treating physicians"); *Fife v. Heckler*, 767 F.2d 1427, 1431 (9th Cir. 1985) ("If the ALJ wishes to disregard the opinion of the treating physician, he must make findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record, even where the treating physician's opinion is controverted by the Secretary's consultant.") As explained by the Sixth Circuit Court of Appeals:

> Surely the conflicting substantial evidence must consist of more than the medical opinions of the nontreating and nonexamining doctors. Otherwise the treating-physician rule would have no practical force because the treating source's opinion would have controlling weight only when the other sources agreed with that opinion. Such a rule would turn on its head the regulation's presumption of giving greater weight to treating sources because the weight of such sources

20

would hinge on their consistency with nontreating, nonexamining sources.

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 377 (6th Cir. 2013). If an ALJ may not reject a treating physician opinion simply because it conflicts with the opinion of a state agency physician, certainly it is not appropriate to excuse an ALJ from even acknowledging a treating physician opinion because a state agency physician had previously rejected it.

Third, the Court rejects the Commissioner's argument that the ALJ's passing reference to Dr. Hussein's October 2010 treatment notes is sufficient to meet the goal of the "good reasons" requirement. The ALJ's entire discussion of Moss' longstanding, permanent cardiac issues is one short paragraph. (Tr. 23.) Although courts have, on occasion, found an ALJ's failure to provide "good reasons" to be harmless error where the ALJ thoroughly evaluates the medical evidence regarding an impairment, that is simply not the case here. The decision herein provides very little discussion of Moss' cardiac problems, despite the fact that it acknowledges his history of valve replacement with coumadin therapy as a severe impairment. (Tr. 19.)

Finally, the Court rejects the Commissioner's argument that "[p]ursuant to *Drummond*,[8] the ALJ's RFC finding here closely tracks Plaintiff's previous RFC from a 2008 ALJ decision."

---

[8] In *Drummond v. Commissioner*, 126 F.3d 837 (6th Cir. 1997), the Sixth Circuit held that the Commissioner is bound by its prior findings with respect to a claimant's disability application unless new and material evidence, or changed circumstances, require a different finding. *Id*. at 842. The Social Security Administration ("SSA") later acquiesced in this ruling. *See* Acquiescence Ruling 98-4(6), 1998 WL 283902 (June 1, 1998) ("AR 98-4(6)"). In AR 98-4(6), the SSA stated that "[w]hen adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding." AR 98-4(6) at * 3.

(Doc. No. 18 at 3.)  The Commissioner's entire explanation of this argument is as follows: "The current ALJ reasonably determined, partly based on Dr. Hughes opinion, that Plaintiff's condition had not improved since the prior determination (Tr. 17).  Therefore, she generally followed the RFC assessment in the prior decision and found that Plaintiff was capable of a reduced range of light work." *Id.*

The Commissioner's brief contains virtually no discussion of the relevant medical evidence.  The Commissioner also fails to discuss the previous ALJ decision or support her argument that Moss' cardiac condition had not changed since then. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir.1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones."); *Meridia Prods. Liab. Litig. v. Abbott Labs.*, 2006 WL 1275512 (6th Cir. May 11, 2006).  Moreover, the Court notes that Dr. Hussein rendered his opinion in March 2008, one month after the previous ALJ's February 26, 2008 decision.

Accordingly, the Court finds the ALJ erred in failing to address Dr. Hussein's March 2008 opinion and, further, that its failure to do so was not "harmless error."  Although there may be many good reasons to reject Dr. Hussein's opinion, the ALJ is required to articulate those reasons in order to allow for meaningful appellate review.  Because the ALJ failed to do so here, the Court is constrained to remand for further consideration of Dr. Hussein's opinion.

## VII.  Decision

For the foregoing reasons, the Court finds the decision of the Commissioner not supported by substantial evidence.  Accordingly, the decision is VACATED and the case is REMANDED,

pursuant to 42 U.S.C. § 405(g) sentence four for further proceedings consistent with this opinion.

IT IS SO ORDERED.


/s/ Greg White
U.S. Magistrate Judge


Date:  January 13, 2015